Filed 9/29/14  P. v. Moreno CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>STEVE MORENO et al.,<br><br>    Defendants and Appellants. | B248088<br><br>(Los Angeles County<br>Super. Ct. No. KA095444) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Bruce F. Marrs, Judge.  Affirmed.

David Arredondo, under appointment by the Court of Appeal, for Defendant and Appellant Steve Moreno.

Jose Romero, under appointment by the Court of Appeal, for Defendant and Appellant Luis Moreno.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendants and appellants Steve Moreno and Luis Moreno[1] (defendants) were convicted of four counts of attempted premeditated and deliberate murder (Pen. Code, §§ 187, subd. (a), and 664[2]), four counts of assault with a firearm (§ 245, subd. (a)(2)), and one count of shooting at an occupied vehicle (§ 246). On appeal, defendants contend that there is insufficient evidence that Steve shot the gun and Luis was the driver of the vehicle; the trial court erred in allowing the prosecutor's expert witness to testify; and the trial court erred in admitting a bullet fragment retrieved shortly before trial. We affirm the judgment.

## BACKGROUND

### A. Factual Background

#### 1. *Prosecution Evidence*

Luis is Leticia Mejia's boyfriend of eight years, and together they have two children. In April or May 2011, Luis was paroled from a previous conviction. In June 2011 Luis and Mejia lived in separate houses located on the same property in El Monte, California. Luis resided in the same house as his brother, Steve. Mejia has known Steve since about 2005, and she described Luis and Steve as having a close relationship.

In October 2005 Rachael Ochoa purchased her silver 2001 BMW X5 as a used vehicle; she received one key to operate it. On June 23, 2011, her vehicle was stolen.

---

[1]  Because defendants have the same surname, we refer to them individually by their first names.

[2]  All statutory citations are to the Penal Code unless otherwise noted.

At about 1:30 a.m. on June 25, 2011, Adonis Galvan, his brother Alexsi Galvan,[3] and a friend, Cesar Viramontes, drove home from a party in Viramontes's Lexus SUV. While they were stopped at a red light heading north on Durfee Avenue at the intersection with Garvey Avenue, a silver BMW SUV pulled up next to them. Adonis testified that Luis was driving the BMW and Steve was a passenger.

Steve made hand gestures and was moving his mouth, but Adonis could not hear the words because the windows in the Lexus were rolled up. Viramontes and Alexsi described Steve's hand signals as gang signs for the El Monte Flores gang. Viramontes understood the intent of the hand gestures was to challenge him to a fight; Viramontes had lived in El Monte all his life and had seen the gang signs Steve made many times in school.

Adonis and Viramontes heard a gunshot. Adonis turned and saw Steve fire a second gunshot round. Viramontes said, "We have to go," and drove through the red light honking his horn. The gun shots continued as they drove under the Interstate 10 overpass. A bullet entered the Lexus's rear window, grazed Alexsi's head, ricocheted through Adonis's headrest, and ricocheted again off his door panel, and then slowed enough for Adonis to catch it. After the Lexus drove under the Interstate 10 overpass, Steve stopped firing his gun, and the BMW turned onto Ferris Road. Alexsi testified that he believed a total of six gun shots were discharged.

Alexsi was bleeding "a lot," and Viramontes drove his vehicle to the hospital. Once at the hospital, Adonis called the police. Bullet fragments were cleaned out of Alexsi's wound, and his wound required stitches and staples. El Monte Police Department Officer Jesus Rojas responded to the hospital, and Adonis gave him the bullet that had hit Alexsi.

Shortly after the shooting incident, Officer Rojas found the silver BMW parked about 250 feet from where defendants resided. When Officer Rojas performed a "records check" using the BMW's vehicle identification number (VIN), he discovered that the

---

[3] Because Adonis and Alexsi have the same surname, we refer to them by their first names.

3

BMW had been stolen. He found a single bullet hole in the front door pillar of the BMW that he believed was possibly caused by the firing a gun from the inside of the vehicle. There was a dent and discoloration noticeable on the outside of the car that was correspondingly caused by the same bullet. El Monte Police Department Detective Adam Girgle examined the vehicle and did not find any fingerprints, bodily oils, or "smudge marks" on it, which fact he found to be "odd."

In photographic lineups, Adonis and Alexsi identified Luis as the driver of the BMW and Steve as the shooter. In a photographic lineup, Viramontes identified Luis as the driver, and also stated that he was "50 percent [certain] that's the guy who shot."

On July 26, 2011, Luis drove Mejia's vehicle into a gas station; Mejia was a passenger. El Monte Police Department Officer Bryan Tromp entered the gas station with his patrol vehicle, and shined his spotlight on Mejia's car, causing Luis to run away. officer Tromp searched Mejia's vehicle, and found under the driver's seat a set of keys, the majority of which were "filed" keys—keys that have been "filed down so [one] could try to steal cars with them."

Adrian Garcia was a shop foreman for BMW of Monrovia. He was involved in the service department's daily operations, was in charge of about 30 technicians, and has worked for BMW for over 12 years. He testified that when a person purchases a new BMW vehicle, like Ochoa's vehicle, they are given four keys—two master keys that operate the vehicle, and two valet keys. One of the valet keys will only unlock the vehicle, and the other valet key will operate the vehicle. The keys that operate the vehicle have a computer chip in them, and over the objection by Luis's counsel, Garcia opined that those keys cannot be duplicated except by BMW North America in New Jersey. Garcia contacted BMW North America by telephone and determined that it did not create any duplicate keys for Ochoa's vehicle.

Detective Girgle gave one of the keys obtained from the search of Mejia's vehicle to Garcia—a valet key that unlocks and starts a vehicle—and asked Garcia whether he could determine the vehicle that the key operated. Garcia placed the key into a "BMW key reader" that is connected to a computer and a corresponding VIN was displayed. The

4

VIN indicated that the key operates a silver colored 2001 BMW X-5. Garcia testified that he was "positive" that one of those keys found in Mejia's vehicle operated Ochoa's car. Ochoa testified that that key was not the key she had received when she bought the BMW. Garcia does not know how records are maintained by BMW of North America in New Jersey. Garcia printed the BMW key reader information and gave it to Detective Girgle.

In August 2011, Adonis was driving with friends north on Durfee Avenue near Ferris Road when he saw Luis walking in the same direction by himself. Adonis's friend advised him to call the police, but Adonis thought it was too late because Luis would be gone by the time the police arrived. Adonis later told Detective Girgle that he saw Luis.

On February 8, 2012, Mejia was driving in Baldwin Hills with Luis as a passenger when she was pulled over by the police. Luis ran but was apprehended by Detective Pete Lopez. Mejia was handcuffed and taken to a police station. Steve was also ultimately arrested.

El Monte Police Department Sergeant Peter Rasic testified that he interviewed Mejia at the police station. Mejia told him that it was Luis who ran from the car, and Luis was a member of the El Monte Flores gang and had engaged in criminal activity. Mejia testified that she did not recall telling police that Luis was a gang member and criminal. Mejia still loved Luis, and she told the police that she "care[d] a great deal" for him.

At trial, Adonis and Viramontes identified Steve as the shooter who shot at Viramontes's vehicle. Adonis identified Luis as the driver of the BMW. At trial, Alexsi identified Steve as the driver of the BMW and Luis the person who shot at Viramontes's vehicle, but he stated that defendants' appearance had changed since the date of the shooting incident—Luis grew his hair, and Steve cut his hair.

Two weeks before trial Adonis found a bullet fragment lodged in the back seat of Viramontes's Lexus. He gave it to Detective Girgle in the courthouse.

Detective Girgle testified as the prosecution's gang expert. He stated that the El Monte Flores was a criminal gang that operated primarily in the cities of El Monte and

5

South El Monte, had over 1,000 members, and its primary activities included stealing cars, residential burglaries, armed assault and robbery, and murder. He opined that defendants were members of the El Monte Flores gang, and the shootings were done for the gang's benefit.

### 2. *Defendants' Evidence*

Emily Penalber testified that in the evening of June 24, 2011, Steve and Luis attended a graduation party in El Monte at Penalber's invitation. Luis and Steve left the party at about 3:00 a.m. on June 25, 2011.

Tatiana Rodriguez testified that in the early morning hours of June 25, 2011, she was working at the corner of Garvey Avenue and Durfee Avenue. Through a glass window she saw two cars—a sedan and an SUV—pass by heading north on Durfee Avenue. She had an unobstructed view of the vehicles, but the window that she was looking through was foggy. She did not see the color of the vehicles because it was dark, and she did not see the vehicles stopped at a red light. She saw two flashes of light come from inside the SUV.

Officer Roger Sardina testified that in the early morning hours of June 25, 2011, Adonis told him that the shots came from a "[n]ewer model" BMW SUV. Adonis also told him that he would not be able to identify the two people who were in that vehicle if he saw them again.

Dr. Kathy Pezdek, defendants' cognitive science expert witness, testified about several factors that affect an eyewitnesses' memory and identification, including, inter alia, the witness distance from and lighting associated with the perceived event; that eyewitnesses overestimate how long they spent looking at something, particularly when under stress; the effect of the witnesses being distracted; the effect of the witnesses' stress; problems associated with cross-race identification; the effect of a delay in time from the observation to the identification; the absence of any correlation between degree of certainty and degree of accuracy; and the tendency of eyewitnesses to confuse people with objects. Based on several hypothetical facts given to her by Steve's counsel, she

6

opined that it was "extremely unlikely" that an eyewitness in Viramontes's vehicle could identify the two people in the BMW.

### B. Procedural Background

The District Attorney of Los Angeles County filed a second consolidated amended information (information) charging defendants with four counts of attempted willful, deliberate, and premeditated murder in violation of sections 187, subdivision (a), and 664 [counts 1, 4, 6 and 8]), four counts of assault with a firearm in violation of section 245, subdivision (a)(2) [counts 2, 5, 7 and 9], and one count of shooting at an occupied motor vehicle in violation of section 246 [count 3]. The information alleged as to counts 2 and 3 that Steve personally inflicted great bodily injury in violation of section 12022.7, subdivision (a), and did so discharging a firearm from a motor vehicle in violation of section 12022.55; as to counts 5, 7, and 9 that he personally used a firearm in violation of section 12022.5; and as to counts 1, 3, 4, 6 and 8 that he personally used a firearm to cause great bodily injury in violation of section 12022.53, subdivisions (b)-(d). As to both defendants, the information alleged as to counts 1, 3, 4, 6, and 8 that a principal personally used a firearm to cause great bodily injury in violation of section 12022.53, subds. (b)-(e). The information alleged as to all counts that defendants committed the crimes for the benefit of a street gang in violation of section 186.22, subdivisions (b)(1) and (4), and they had each served a prior prison term as defined by section 667.5, subdivision (b).

Following trial, the jury found defendants guilty on all counts, and found that the special allegations were true. Steve admitted the prior prison term allegation. The trial court dismissed the prior prison term as to Luis.

The trial court sentenced Steve to state prison for a term of 160 years to life, consisting of 15 years to life each on counts 1, 4, 6, and 8 with the gang enhancement, plus 25 years to life on each of those counts for the personal use of a firearm great bodily injury enhancement. He was sentenced concurrently to one year in state prison for the

7

prior prison term. The trial court stayed sentence on counts 2, 3, 5, 7, and 9, and on all other firearm enhancements.

The trial court sentenced Luis to state prison for four life terms plus 100 years to life in prison consisting of a life term each on counts 1, 4, 6, and 8, plus 25 years to life on each of those counts for the principal use of a firearm great bodily injury plus gang enhancements. The trial court stayed sentence on counts 2, 3, 5, 7, and 9, all other firearm enhancements.

The trial court awarded defendants custody credit, and ordered them to pay various fees, fines and penalties. Defendants filed timely their respective notices of appeal.

## DISCUSSION

### A.    Substantial Evidence

Defendants contend that the evidence was insufficient to show that Steve shot the gun and Luis drove the vehicle. We disagree.

#### 1.    Standard of Review

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence. [Citation.]" (*People v. Medina* (2009) 46 Cal.4th 913, 919.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "Substantial evidence includes circumstantial evidence and

the reasonable inferences flowing therefrom." (*People v. Ugalino* (2009) 174 Cal.App.4th 1060, 1064.) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.]" (*People v. Zamudio*, *supra*, 43 Cal.4th at pp. 357-358.) In determining whether substantial evidence supports a conviction, "we do not reweigh the evidence, resolve conflicts in the evidence, draw inferences contrary to the verdict, or reevaluate the credibility of witnesses." (*People v. Little* (2004) 115 Cal.App.4th 766, 771, citing *People v. Jones* (1990) 51 Cal.3d 294, 314.)

### 2. Analysis

There is substantial evidence that Steve shot the gun and Luis drove the vehicle. Adonis and Alexsi identified Luis as the driver of the BMW and Steve as the shooter of the gun in photographic lineups. Viramontes identified Steve as the shooter at trial. At trial, Adonis again identified Luis as the driver of the BMW and Steve as the shooter.

Defendants contend that evidence is insufficient to show that Steve was the shooter and Luis drove the vehicle because: (1) Officer Sardina testified that, immediately after the shooting, Adonis told him that he could not identify the two people who were in that vehicle if he had seem them again; (2) Viramontes identified Luis in a photographic lineup but said that he was only "50 percent [certain] that's the guy who shot;" and (3) at trial, Alexsi identified Steve as the driver of the BMW and Luis shot the gun. In addition, defendants introduced evidence as to unreliability of eyewitness evidence.

Any lack of certainty of the identity of defendants by the witnesses goes to the weight, not the sufficiency, of the evidence. "The strength or weakness of the identification, the incompatibility of and discrepancies in the testimony, if there were any, the uncertainty of recollection, and the qualification of identity and lack of positiveness in testimony are matters which go to the weight of the evidence and the credibility of the witnesses, and are for the observation and consideration, and directed solely to the attention of the jury in the first instance . . . . [Citation.] The general rule,

9

then, is that it is not essential that a witness be free from doubt as to one's identity. He may testify that in his belief, opinion or judgment the accused is the person who perpetrated the crime, and the want of positiveness goes only to the weight of the testimony. [Citations.]" (*People v. Lindsay* (1964) 227 Cal.App.2d 482, 493-494; *People v. Edwards* (1981) 126 Cal.App.3d 447, 457 ["The weight of the identification evidence [regarding a car] is for the trier of fact"].) A witnesses "failure to make a positive identification of appellant based on photographic displays merely goes to the weight of the evidence, not its sufficiency." (*People v. Prado* (1982) 130 Cal.App.3d 669, 674.) "Weaknesses and inconsistencies in eyewitness testimony are matters solely for the jury to evaluate. [Citation.]" (*People v. Allen* (1985) 165 Cal.App.3d 616, 623, overruled on other grounds in *People v. Berry* (1993) 17 Cal.App.4th 332, 338-339; see *People v. Hill* (1998) 17 Cal.4th 800, 849.)

Although in a photographic lineup Viramontes identified Luis as the driver, and that he was "50 percent [certain] that's the guy who shot," as noted above, at trial he identified Steve as the shooter. And although Alexsi identified Steve as the driver of the BMW and Luis as the shooter at trial, he stated that defendants' appearance had changed since the date of the shooting incident.

Even the testimony of one witness is sufficient to prove any fact. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181 [The testimony of a single witness is sufficient to support a conviction].) In essence, defendants ask that we reweigh the evidence. This we cannot do. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170 ["""A reviewing court neither reweighs evidence nor reevaluates a witness's credibility"""].)

### B. Expert Witness Testimony

Defendants contend that the trial court abused its discretion in allowing Garcia to testify as an expert witness that (1) based on his telephone conversation with BMW North America in New Jersey, only three keys existed that operate Ochoa's vehicle; and (2) based on a computer search of BMW's records, a key obtained from the search of Mejia's vehicle operated Ochoa's vehicle. We disagree.

10

### 1. Background Facts

As noted, a key that operated the stolen BMW was found in Mejia's vehicle.[4] Before Garcia testified, Luis's counsel challenged the prosecutor's request to call Garcia to testify about the records in BMW's key database because that testimony would be based on inadmissible hearsay. The prosecutor stated that Garcia's testimony would be admissible under Evidence Code section 1271's business record exception. The prosecutor argued that Garcia was the "shop foreman" for BMW of Monrovia, and in order for him and his crew to work on the vehicles, they had to have access to BMW's computer database. Garcia sometimes determines whether additional keys have been made for a particular vehicle by contacting BMW of North America by telephone. Garcia contacted BMW of North America by telephone and determined that no additional keys have been made for Ochoa's BMW. The information obtained by Garcia was "reliable and trustworthy" because of the size of BMW of North America, and without it having established practices for keeping records, its business of serving and repairing BMW vehicles would be negatively impacted. The trial court stated also that BMW of North America is required under federal law to maintain "a whole pile of records."

Luis's counsel stated that the prosecutor offered no evidence that the records were made near the time of the event, and that Garcia admitted to "having seen a lag-time" of up to one month before the information was entered. Additionally, Luis's counsel stated that Garcia was not a qualified witness under Evidence Code section 1271 because he was not the custodian of records for BMW of North America. Luis's counsel also argued that the prosecution has not provided a citation reference to the federal law concerning maintaining records regarding the keys to the vehicles with which BMW of North America was purportedly in compliance, and there is no evidence that BMW of North America was actually in compliance with that federal law.

---

[4] Inexplicably, Ochoa, the owner of the stolen BMW testified that she did not receive that key when she bought the BMW. We could find no explanation how defendants might have a key that operated Ochoa's car when she did not receive that key.

11

The trial court responded that one month is still near the time of the event in this case; regardless of whether the business records exception applies, Garcia qualified as an expert witness under Evidence Code section 801; and that hearsay was therefore admissible. The trial court said, "We're talking about subjects that are beyond the common experience such that the opinion of the expert would assist the trier of fact. [¶] Now, there's no way that the average citizen is aware of how automobile keys in the modern generation function[,] are kept, how they actually work in conjunction with other well-known security items such as I.D. numbers, et cetera. [¶] And as an expert, he's certainly allowed to consider hearsay in forming an opinion that there are no other keys out there according to his understanding of the procedure and the records." Defendants' counsel noted their objections.

### 2. *Analysis*

Evidence Code section 720, subdivision (a) provides, "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." "Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357.) "[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony." (*People v. Hogan* (1982) 31 Cal.3d 815, 852, disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.) An expert may rely upon hearsay and other inadmissible matter in forming an opinion. (Evid. Code, § 801, subd. (b).) "[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 219.)

"The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court. [Citations.] That discretion is necessarily broad: 'The competency of an expert "is in every case a relative one, i.e. relative to the

12

topic about which the person is asked to make his statement." [Citation.]' [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175.)

Garcia was a shop foreman for BMW of Monrovia, and therefore was involved in the service department's daily operations. He testified that when a person purchases a new BMW, as Ochoa's vehicle, they are provided with four keys, three of which operate the vehicle. He also testified that because the keys that operate the vehicle have a computer chip in them, those keys cannot be duplicated except by BMW North America in New Jersey. As the shop foreman, it is reasonable to conclude that these are matters within his special knowledge, skill, experience, training, or education. (Evid. Code, § 720, subd. (a).)

Garcia testified that he contacted BMW North America by telephone and determined that it did not create any duplicate keys for Ochoa's vehicle. He also testified that based on a computer search of BMW's records, a key obtained from the search of Mejia's vehicle operated Ochoa's vehicle. The statements made by the representative of BMW North America during the telephone conversation, and BMW's records concerning the keys it produced that operate a particular vehicle, are hearsay evidence—out of court statements offered to prove the truth of the matter asserted. (Evid. Code, § 1200.) As noted above, however, an expert may rely on hearsay. (Evid. Code, § 801, subd. (b).)

Defendants contend that the trial court abused its discretion in admitting Garcia's testimony regarding the number of keys that are provided upon the purchase of a new BMW. Defendants argue that this testimony does not require any special training or experience because anyone who buys a new vehicle knows this information. Defendants presume, without any supporting evidence, that the jury members have all purchased a new BMW. Garcia's testimony regarding the number of keys that are provided upon the purchase of a new BMW "would be likely to assist the jury in the search for truth." (*Alef v. Alta Bates Hospital*, *supra*, 5 Cal.App.4th at p. 219.)

Defendants argue that Garcia's testimony "is particularly damaging because it suggests and implies that the subject BMW here [was] the vehicle that [was] used in the crime." Even if the trial court erred in admitting Garcia's expert testimony, any error was

13

harmless under the standard of either *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [more favorable outcome for defendant reasonably probable absent error], or *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]. Regardless of whether the BMW was used in the shootings, several witnesses identified Steve and Luis as the occupants of a vehicle, and there was evidence that the shots came from that vehicle.

## C.    Admission of Evidence

Defendants contend that the trial court erred in admitting into evidence the bullet fragment retrieved by Adonis shortly before trial because they could not test it to determine whether it was fired from the BMW, and whether it was fired from a semi-automatic handgun, as opposed to a revolver. The trial court did not err.

### *1.    Applicable Law and Standard of Review*

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1140, overruled on other grounds as stated in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Alvarez* (1996) 14 Cal.4th 155, 203.) "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason."' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 714.) If the erroneous admission "implicates defendant's federal constitutional rights to due process and concerns the fundamental fairness of his trial, we will apply the de novo standard of review." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225, fn. 7.)

### *2.    Background Facts*

On March 5, 2013, the prosecutor and defendants' counsel discussed with the trial court the prosecutor's intention to question Adonis about a bullet fragment that he found. The prosecutor told the trial court that earlier that day (during trial) Adonis gave Detective Girgle a bullet fragment that he had recovered from Viramontes's vehicle two weeks earlier. Detective Girgle gave the fragment to the prosecutor, who in turn showed

14

it to defense counsel. The trial court stated that it found the fragment relevant, but that it was not "a major part of the case" because no serious challenge had been made that a shooting had occurred.

Steve's counsel told the trial court that he was skeptical that Adonis actually found the bullet fragment after the vehicle had been searched by police. Luis's counsel questioned who would identify what Adonis found as a bullet fragment. The prosecutor responded that Adonis could identify it as a bullet fragment based on the bullet that he had caught the night of the shooting.

Steve's counsel argued that Adonis could not state that the bullet and the bullet fragment came from the same weapon; that requires a ballistics comparison that should be performed by the police. The trial court found that such a comparison would be irrelevant because the weapon was never recovered. Counsel for both defendants argued that they were unable to perform tests and an investigation to determine if the bullet fragment was from the shooting incident at issue in this case, or from a different incident. In response the trial court stated, "It would appear that the objections would go more to weight than to admissibility, if the witness recognizes this as something he found and can tell us where he found it. And cross examination of [Viramontes] would certainly be reasonable as to the number of times [Viramontes]'s car has been shot up. In which case, by inference it would be possible to be another shooting as opposed to this one. [¶] If it's only been one, you can certainly argue it was a long time [sic] and couldn't possibly be related. That would be a jury decision." The trial court stated also that Detective Girgle could identify it as a bullet fragment.

### 3. *Analysis*

The Attorney General argues that to the extent that defendants are contending that their counsel should have been granted a mid-trial continuance to conduct tests on the newly-recovered bullet fragment, they forfeited that contention. We agree with the Attorney General; defendants' counsel never made a request for such a continuance. A party may not raise an argument on appeal that he or she did not raise before the trial

15

court. (*People v. Riccardi* (2012) 54 Cal.4th 758, 810 ["[w]e discern in the record no defense request for a continuance to allow further evaluation of the . . . tape, and hence defendant has forfeited this claim"]; *People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13, ["[w]hen a party does not raise an argument at trial, he may not do so on appeal"], disapproved on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Even if defendants did not forfeit their contentions on appeal, defendants did not establish that the trial court erred. "All intendments and presumptions are indulged to support [the judgment or order] on matters as to which the record is silent, and error must be affirmatively shown." (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Regarding whether the bullet fragment was fired from the BMW, there is no evidence in the record that the bullet from which the fragment came was the bullet that was fired into the pillar of that vehicle, particularly because there is no evidence that the bullet ever left the vehicle. The record does not reflect that there was a hole through which the bullet would exit the vehicle; there was evidence only of a corresponding dent. There also is no evidence that, given the trajectory of the bullet, the bullet would have penetrated through the pillar of the BMW into the back seat of Viramontes's vehicle— where Adonis found the bullet fragment.

In addition, Adonis found a bullet fragment, not a complete bullet, lodged in the back seat of Viramontes's vehicle. Indeed, the trial court described the bullet fragment as looking "like the bottom of a fully copper jacketed bullet . . . ." There is no evidence in the record that the *bullet fragment* could have been tested to determine whether it was shot from the BMW.

Regarding the testing of the bullet fragment to determine whether it was shot from a revolver or semi-automatic pistol, Alexsi testified that he could not remember whether a semi-automatic gun or a revolver was used during the shooting incident. He testified, however, during the preliminary hearing that "it looked [to him] like a revolver" was used in shootings. Defendants therefore contend that the trial court erred in introducing into evidence the bullet fragment because they could not test it to determine whether it

16

was fired from a semi-automatic handgun, as opposed to a revolver.  As with the feasibility of testing the bullet fragment to determine whether it was fired from the BMW, there is no evidence in the record that the *bullet fragment* could have been tested to determine whether it was shot from a revolver or semi-automatic pistol.

Even if the trial court erred in admitting into evidence the bullet fragment, any error was harmless under the standard of either *People v. Watson*, *supra*, 46 Cal.2d at p. 836, or *Chapman*, *supra*, 386 U.S. at p. 24.  Defendants argue that testing of the bullet fragment to determine whether it was fired from the BMW vehicle could have resulted in "exonerating evidence that the subject BMW is not the one used in the crime . . . ."  As noted above, regardless of whether the BMW vehicle was used in the shootings, there was substantial evidence that defendants were occupants of a vehicle from where the shots were fired.

In addition, even if Alexsi mistakenly identified the gun that was involved in the shooting as a revolver, that mistake was insignificant.  Defendants did not challenge whether the bullet caught by Alexsi mid-air and given to Officer Rojas was shot from the BMW based on a ballistics analysis of that bullet.  In addition, regardless of the whether a revolver or a semi-automatic gun was used during the shooting, as noted above, there was substantial evidence that gun shots came from defendants' vehicle.

17

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.



We concur:



TURNER, P. J.



MINK, J.[*]

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.